Good morning. May it please the Court, William Eubanks on behalf of the Plaintiffs' Appellants, and I'd like to reserve a few minutes of my time for rebuttal. Before the Court is a fatally flawed decision by the Bureau of Indian Affairs authorizing a highly controversial wind energy project that poses grave risks to federally protected Golden Eagles. Plaintiffs have identified several avenues for this Court to conclude that this action was arbitrary, capricious, and violated NEPA, in addition to this Court's own precedence. Before turning to the specific legal arguments at issue, I want to highlight three undisputed facts, just to highlight what is not in dispute here for the Court. First, this project will kill federally protected Golden Eagles. The only dispute, which was never subjected to any scrutiny under NEPA, is whether a smaller number of Eagles will be killed, as BIA asserts, or whether a much larger number of Eagles will be killed, as was the expert conclusion of the U.S. Fish and Wildlife Service, which has statutory expertise to conserve these Golden Eagles. Second, it is also not in dispute that BIA officials stated in the record that BIA lacks biological expertise with respect to quantifying impacts to Golden Eagles. That's at ER 176. And third, despite this conceded lack of biological expertise within the Bureau of Indian Affairs, BIA nevertheless refused to adopt the methodology that the Fish and Wildlife Service said was the best means of quantifying Eagle mortality. BIA refused to analyze the alternatives, the specific alternatives, that the Fish and Wildlife Service repeatedly told BIA was the best means of significantly reducing Eagle mortality from this project. And BIA ultimately disagreed with the expert federal agency, the Fish and Wildlife Service, as to the mortality risks here, as well as the efficacy of mitigation measures, without ever explaining in the administrative record why or how the expert federal agency was wrong in making those determinations. If I can ask you a question regarding failing to condition the lease on an Eagle Act, the Eagle Act permit. Sure. Yes. I was going to start with the NEPA issues, but I'm happy to turn to the APA issues. Doesn't our decision in Tool 1 foreclose the argument that the lease is not in accordance with the law because it's not conditioned on the Eagle Act permit? Well, so there are two responses to that, Your Honor. So the first, with respect to the in accordance with law argument that we've made, our sort of fallback argument there, we don't believe Tool 1 forecloses it. And in fact, it doesn't really speak to this issue. Here, unlike in Tool 1, we have a situation where the U.S. Fish and Wildlife Service has already determined that many dozens of golden eagles will be killed, thereby impairing the BIA, which was a question in Tool 1. Number two... In Tool 1, are you saying that they established that no eagles would be killed? There was a question. There was a factual dispute as to whether eagles would be killed. We do not have that factual dispute in this case. And related to that, here, we know from the U.S. Fish and Wildlife Service, which is the agency that administers the Bald and by BIA, is not likely to be able to obtain a permit because the risks are too great. And by providing that, which did not exist in Tool 1, it is a situation in which BIA knew at the time it issued its decision that this project would almost certainly not be eligible for a permit under that Act. But the BIA didn't say go ahead and take eagles while the permit is pending. They said apply for a permit. And by the way, you have to comply with the Eagle Act at all times. And so I'm just trying to figure out how is that contrary to the law? Well, so that actually gets to our first argument under the APA, not the contrary to law piece, but just arbitrary and capricious, which flows directly from the Supreme Court's decision in State Farm. And so I'd like to spend a moment on that because we think it's really critical. What BIA did here wasn't just say comply with all federal laws or comply with BEGEPA, which is the Bald and Golden Eagle Protection Act. What it said, it did much more than that and in a much more problematic and irrational way. In the record of decision of ER 45 to 46, BIA states in the ROD that the project proponent quote has agreed to comply with all applicable federal laws, including the requirement for an eagle take permit under BEGEPA. It continues, this is the very problematic part, submitting a take permit application to the U.S. Fish and Wildlife Service will satisfy this requirement and enable the applicant to move forward with construction and operation. That is not what BEGEPA says. And the Fish and Wildlife Service told them that would violate BEGEPA. You cannot operate a project that is known to kill eagles until you have a permit in hand. Simply applying for a permit will never satisfy the act. You actually have to obtain it. And so when the Fish and Wildlife Service is on record at ER 102 saying that if BIA is going to put this kind of language in its record of decision, we recommend that BIA condition the lease on the project actually obtaining a permit quote prior to project construction, the Fish and Wildlife Service is saying this is an irrational and incoherent way for BIA to step into a statute it has no authority to administer and to tell the project proponent that if you do X, you are complying with this federal law in a way that is not actually complying with the federal law. So our very basic and narrow proposition is because BIA chose to get involved and did this in such an irrational and incoherent manner that's inconsistent with BEGEPA, that is what is arbitrary and capricious. Is it your argument that they were telling them they didn't have to comply with the law? Didn't they say that they would be responsible that they had to comply with all applicable laws and that they were responsible for any criminal and civil penalties that ensued if they didn't comply with those laws? They certainly made some generic statements to that effect. Again, the problem here is rather than just saying comply with all federal laws, BIA chose to step into something it stated it in such a way so that the project proponent now believes based on this lease that if it complies with the terms that BIA placed in the lease, it is complying with BEGEPA. So in the event that down the road the project proponent applies but does not actually obtain a permit, which has happened here, for the record, it is not in dispute that there was an application for a permit that was rejected. That's in our complaint. The federal government has conceded that in its answer. The project proponent may well believe that it has complied with this requirement under BEGEPA even though it can't as a matter of law and as Fish and Wildlife Service explained. For phase one of the project, was there a similar request from the Fish and Wildlife Service that the approval be conditioned on the Fish and Wildlife Service approval of the EGLE Act permit? So in Thule 1, I am familiar with that record as well, and in that case it just made a very broad, generic statement. BLM, a different agency, just said comply with all federal laws including BEGEPA. That's the distinction here is that BIA chose to step in halfway and made statements that are flatly contrary to what BEGEPA says you have to do to comply with law. And putting this into context, getting back to your question, Judge Ammon, if the Fish and Wildlife Service were to prosecute in the future, if this project proceeds without a permit, we know full well that the developer will say, we were told what to do in the lease and we did that and we believe that to be sufficient. But how is that, I mean, it goes on to say that they remain responsible for complying with all applicable federal laws. How could they make that argument? Right, but the part that is especially problematic here is that the ROD says that they will comply. BIA states that the project proponent... Where are you reading from? I'm sorry, this is ER 45 to 46. Submitting a take permit application to the U.S. Fish and Wildlife Service will satisfy this requirement. Which requirement? The sentence before that says, including the requirement for obtaining an EGLE take permit under BEGEPA. By definition, submitting an application for a permit does not comply with the requirement to obtain a permit. And so by setting in place a blueprint for a project proponent that is inconsistent with law, that was arbitrary and capricious. And we believe that flows directly from the Supreme Court's decision in State Farm as well as this Court's precedents implementing it. So I guess, won't the permitting process with the Fish and Wildlife Service protect many of the interests that you're trying to protect? I guess, why isn't that sufficient? It seems like the Fish and Wildlife Service is not inclined to grant the permit. It may not, but the problem we have here is the project proponent is under the belief, it's under the understanding from BIA that as long as it applies for a permit, even if it never obtains one, that is sufficient to comply with the Bald and Golden EGLE Protection Act, which is not consistent with how that act is written. And so the developer's argument during a permitting process, if it comes to one, or during a future enforcement proceeding, if there ever were one, would be that, hey, we were given a lease, we were told to do this, and we did it. And they have applied for one. So again, the developer's complied with this, and we can go forth and build this today. There is nothing stopping us because we have submitted an application, which is all BIA required us to do. And so by stepping into another agency's jurisdiction and taking away Fish and Wildlife Service's pre-construction ability to be involved in the siting process as part of that permitting decision is why Fish and Wildlife Service said, this is not consistent with the act that we administer. They said, if BIA is going to step into this process in this fashion, it must ensure that that permit is obtained prior to construction so that we, the Fish and Wildlife Service, have the abilities, the expert agency, to say, these turbines are too risky. You need to modify them in some fashion. These are less risky. We're willing to let those go forward and be built in this fashion. You have to give the expert agency the chance to do that, or else BIA, which lacks not only statutory expertise, but also admittedly lacks biological expertise, has now been allowed to supplant the expert agency's job and do what it is required to do by Congress under the Bald and Golden Eagle Protection Act. So we would submit that is textbook arbitrary and capricious decision making. So now turning to the NEPA issues, we have three distinct NEPA claims that we've brought in this case, and we believe they all stem from a common core of facts. We would submit that the public here was subjected to a major bait and switch. As the Court is aware, in 2011, the Bureau of Land Management rejected the approach advocated by BIA by adopting a preferred alternative in its EIS that rejected, at that time, the building of any turbines on the BIA ridgelines. Instead, what it said in ER 149, and this is in the EIS, is at this time, we cannot quantify the risks to golden eagles, and those risks cannot be determined with respect to ridgeline turbines because we just don't have the analysis yet, but preliminary concerns coming in from the Fish and Wildlife Service are that there are grave risks. And so they built in at 146 to 147 in the excerpts of record, this very important measure that we have focused on heavily in our briefs. I'm not going to read it all because it's long, but to paraphrase, it says that no turbines will be built on the ridgeline unless and until further analysis shows that each of those turbines meets the acceptable level of risk. And the criteria that were supposed to be developed to determine the level of risk had to be done between the Bureau of Indian Affairs and the U.S. Fish and Wildlife Service as the expert resource agency. In reality, what happened is, after that EIS was issued, the BIA never determined those final criteria with the service. They did bird studies, they did telemetry studies, they made the decision to shut down two of the turbines at certain periods of high risk to eagles. Why isn't that doing what you're saying they're not doing, and why isn't that a significant mitigation action here that they took? If I understand it, the whole purpose of NEPA is to have an entity take into account environmental risk, but it also has a balancing function here. This is an activity that is beneficial. It's renewable energy for the Indian Reservation. It's going to provide jobs for the Indian Reservation. Why is it arbitrary and capricious to permit this to go forward when you have looked at the situation, you've done studies, you've made the decision to limit the operation of certain turbines that pose a high risk to eagles, but there's nothing that I understand says that they have to show that there will not be a single eagle death here. So it just seems I'm not clear on why what they did was arbitrary. The question here is not whether this project can ultimately proceed and whether this project can ultimately kill some eagles. The question is whether under NEPA they've followed the correct analytical procedures, especially given the grave risks that the expert agency that administers the Bald and Golden Eagle Protection Act has said this project presents to eagles. And so here, what the Fish and Wildlife Service said is you need to use this specific methodology to quantify mortality. BIA, lacking expertise, said, no, we're going to use something else. The Fish and Wildlife Service said this presents a high risk to eagles. We disagree with your mortality estimates. We think it will be far higher and, you know, also... So they have to accept that? They do not have to accept it, but they at least have to engage in some sort of analysis under NEPA. This gets back to the NEPA point. Because this was never looked at in the EIS, it necessarily could not have been. It all was based on massive amounts of new information, as well as a dispute between BIA and the expert federal agency. You say massive amounts of new information. What was new about the information? It may have been different information, but what was really new about it? It was incredibly new information, Your Honor. Again, I'll point the court back to ER 149, where in the EIS, BLM said, we cannot assess under NEPA the impacts of the ridgeline turbines because the risks, quote, the risks to golden eagles cannot be determined at this time without further analysis. Once that further analysis came in, for the first time ever, the Fish and Wildlife Service said, we have major disagreements and disputes and objections with BIA about what the mortality estimates look like. Fish and Wildlife Service explicitly found that the mitigation that Your Honor referenced would not alleviate the concerns and, in fact, would do almost nothing because they said that it's not for a long enough duration to the wrong times of the year, and it doesn't deal with siting, which is the best means of actually reducing this. So we have a clear-cut controversy under NEPA significance regulations. A controversy is defined as a substantial dispute. And here we have a substantial dispute between two designated experts for this purpose, never subjected to NEPA review. So while I agree with, you know, I understand what Your Honor is saying, that NEPA is procedural and you have to look at this, by definition, these issues weren't looked at in the original EIS. They couldn't have been. And then two years later, BIA decided to go forward with essentially the same alternative that the original EIS rejected and said had to go through this new process without ever subjecting any of that to scrutiny. The public never got a chance to weigh in on that. The public never knew about this massive controversy between the Fish and Wildlife Service and BIA. The supplemental plan was put out for public review, correct? Supplemental plan is absolutely not a NEPA document. The supplemental plan, everyone agrees in this case, was a self-serving document prepared by the project proponent. It was not prepared by BIA. It was put out for public comment, though, correct? It was put out for a very brief 30-day public comment period. It was not ever intended to be a NEPA document prepared by EIA. We would submit that the Ninth Circuit's decision in Booty is very instructive because in that case, there was a rejected alternative in a prior EIS, and then that agency, which was BLM, turned around very soon thereafter and did essentially the same thing it said. But there was nothing, per se, rejected that was changed, correct? In this case, we would not agree with that. BIA has made clear it believes it was rejected. So what BIA says at ER 127 in their November 2011 letter, right after the EIS was issued, says BLM's preferred alternative effectively eliminates all the turbines from the tribal ridgeline and only retains those turbines in the McCain Valley, the BLM portion. So BIA certainly believed that its approach had been rejected, at least for the time being. So for BIA to then turn around two years later and allow all of those turbines to go forward without ever even taking a look at approaches that might only authorize some of those turbines, not every single one, that violates NEPA. I'm sorry, when you turn them off, that is the equivalent of not using them for a period of time, right? Or not having them there. That is equivalent to that, but again, the U.S. Fish and Wildlife Service, the expert agency said that will not work here. That was never subjected to NEPA review. That's the point. We're not saying this project can never be built, it can never operate. What we are saying is NEPA requires, under this court's precedence, which are controlling and binding on this court, that when a new thing happens or something that's been previously rejected, Booty says, you absolutely have to take a look at that, provide the public assistance to weigh in. Talk about the substantial dispute between the expert agency and BIA. None of that was done here. Can I ask you a question? I was just going to try to interject one question. Would you say that the BIA did or did not take a hard look at the issues raised by Fish and Wildlife Service? Absolutely not, Your Honor. As we've argued in our briefs extensively, Fish and Wildlife Service said, here's the methodology you need to use because it's the current most up-to-date methodology for quantifying eagle mortality. BIA said no. Fish and Wildlife Service said, you need to look at these specific configurations that would significantly reduce eagle mortality. BIA never did that. That should have been done in a new EIS, either a new EIS or a supplemental EIS. There are so many of those disputes between the expert agency and BIA. Never once was that subjected to any scrutiny under NEPA, and as a result, it failed to take a hard look. It's a failure to look at reasonable alternatives under three of this Court's precedents, including your Honor's decision in Western Watershed's project versus Abbey. We believe under this Court's precedents, there is absolutely no basis for concluding that the lack of any NEPA review whatsoever somehow satisfies NEPA. I understand you dispute the estimates of the number of eagles that will be killed by the project, but I had a hard time locating the record, a real comparison between the BIA number or estimate, which is I think three to six over the life of the project, and what the Fish and Wildlife Service or you think is the more likely estimate. Can you help me with that? Yes, Your Honor. I won't weigh in as to what I believe the correct answer is. I'll rely upon the service, given their expertise. What they stated in various places, so there are two letters that are particularly helpful. One's at ER 101 to 102, and one is ER 112 to 114, and what they said is that, quote, we do not concur with the analysis presented in the plan or with the calculated mortality estimates of 0.14 to 0.18 eagles per year, and instead what they go on to say is we believe there is a high risk of losing a productive pair of eagles per year. So assuming that were to happen in the first or second year of this project, that means that alone would be close to 80 mortalities over a 20-year period in addition to the other mortalities caused by collision. So you're correct that there is not a pinpoint number that is used, but it is many dozens that the Fish and Wildlife Service believe to be occurring here, and they made clear this is not just going to the entire regional eagle population, which is quite small. Did you have another question? I just had one question. I believe that you said, and I may have misunderstood you, so I want to make this point, that somehow the BIA led TOOL to believe that they could violate the Bald Eagle Protection Act in terms of the permitting process, because it's not There's a statement, and I'm looking at the rod that says, however the applicant remains responsible for complying with all federal laws, including the BGEPA, goes on to say any take of eagles caused by the project prior to the issuance of an eagle permit constitutes a violation of BGEPA that the FWS may refer to the Department of Justice for enforcement. Any unauthorized takes of eagle is a violation of that statute. Isn't that making it pretty clear to them that they're not condoning that or authorizing that? If that were all that BIA said, we might have a different case, Your Honor. That is not what BIA said. What BIA continued to say, again, at ER 45 to 46, which is an irrational exercise of discretion on BIA's part, and thus has to be set aside as arbitrary and will satisfy this legal requirement and enable the applicant to move forward with construction and operation of the project. That is not consistent with the law. That is not consistent with what Fish and Wildlife Service said in the record. And by choosing to insert itself needlessly into what BGEPA's requirements state, that is classic arbitrary and capricious decision making that the Supreme Court has repeatedly said cannot be upheld. Thank you. May it please the Court, my name is Alan Brabender, and I'm representing the Bureau of Indian Affairs. With me at council table is counsel for the interveners, Tuli Wind and the Wiyopi Band of Kumeyaay Indians. I intend to use all 20 minutes unless there are specific questions for intervener's counsel. First, let me talk about BIA's role in this matter, which is that of the federal agency responsible for overseeing the statutory trust relationship with Indian tribes. It is in that limited role that BIA decided to, or took on the question of whether to approve the lease between Tuli Wind and the tribe. But note, it is the tribe and not BIA that decided to lease its lands. And it's the tribe and not BIA that negotiated the lease. For its part, BIA approved the lease because of the substantial economic benefits it would provide to the Wiyopi Band. The Wiyopi Band being one of the poorest in California, and it has very limited opportunities for economic development. I have to say, but I've never seen a case where there's been so much interagency, strong dispute here. So this is at least novel a little bit for me. And so I have some questions regarding the dealings with the Fish and Wildlife Service in this case, because it appears, or do you dispute, that the Fish and Wildlife Service is the expert agency here on establishing and estimating harm to eagles? We do not dispute that the BIA is. And so if they are the expert, what amount of deference or consideration is BIA required to give Fish and Wildlife in making these decisions? None. I'm sorry, what? None, and let me explain why. It's because BIA has a different statutory mission than the Fish and Wildlife Service. BIA's statutory mission is to promote the interests, both social and economic, of Indian tribes. That's a different mission from that of the Fish and Wildlife Service, which is to promote the interests of fish and wildlife. It is BIA's decision here, and I think we have to keep in mind the statutory claims being made. NEPA is a purely procedural statute. It does not require a particular substantive result. And as far as NEPA is concerned, it doesn't require even the... So the BIA can just say, well, you know, if 100 eagles are killed every, you know, week, we don't care. That's not with our mission, so that's too bad. That's correct, because under NEPA, there's no substantive result that's required. Counsel, if I could interject a question. Doesn't NEPA require the agency, the BIA, to take a hard look at what the Fish and Wildlife Service position is here, and to discuss that hard look in its impact statement, so that if there's new data or a new position of FWS, that there should be a supplemental impact statement to show that the agency considered the issues, and so the public is aware, the public has knowledge of this? Well, what the requirement is under NEPA is that any comment expressed on a draft EIS should be addressed in the final EIS. But none of the comments that plaintiffs are relying on are on the draft EIS. They came much later, after the project EIS has been finalized. And the Fish and Wildlife Service's concerns with eagle impacts are not new. This has always been the Fish and Wildlife Service's position. And there's not a substantial disagreement over the impacts. Counsel, I think, is hyperbolizing quite a bit in his presentation. The notion that there's going to be four eagle takes a year is not the Fish and Wildlife Service's position. That is putting a different spin on what the EIS already says, is that there is a potential in a worst-case scenario that a nesting territory could be lost. And the BIA explained that while there is this sort of potential, it's not a likely scenario, because none of the scientific literature shows that an abandonment of a nesting territory is likely just because of a wind project. In fact, there's eagle nests next to wind projects all over the United States. And the BIA's response to Fish and Wildlife Service on this issue is at Supplemental Excerpts of Record, page 1405 and 1406. Now, the implications of losing a nesting territory need to be distinguished from the use of the Fish and Wildlife Service model to calculate collisions. What type of restrictions can the Fish and Wildlife Service then put on the project in the Eagle Act permitting process that would operate as real and substantial checks here? What I'm concerned about is the lease being approved, the project going forward, and then the project does a lot of damage to the eagle population even in the construction phase. Would the Fish and Wildlife Service have the power to shut the project down, or will that be too late at that point? Well, nothing that BIA did is going to affect the Fish and Wildlife Service's decision with respect to the Eagle Act. The Fish and Wildlife Service remains free to impose additional obligations and restrictions. And if Thule takes an eagle without a permit, as BIA warned, it could be prosecuted criminally, it could be prosecuted civilly, and it will be also in violation of the lease. Thule risks losing its lease if it takes an eagle without authorization. So, of course, Thule has every incentive to work with the Fish and Wildlife Service, as it has been doing, to come into compliance with the Eagle Act. So what are the consequences of the Phase 2 if the Eagle Act permit is denied? Well, that would be an issue for Thule Wind itself. As this court held in Thule 1, BIA does not have any responsibility to ensure Thule's compliance with the Act. It's solely Thule's own responsibility. So if Thule builds the Phase 2, and my understanding is construction is not imminent, and Thule has applied for a permit, but if Thule decides to construct and operate the permit, or operate the project, and it takes an eagle, that's a calculation of risk for Thule to make. It's not something that BIA has a role in. Let me ask you about consideration of other alternatives or mid-range alternatives, as they were referred to, because there's arguments that have been made that it's unreasonable not to have considered some mid-range alternatives that were presented or should have been considered. And it's been argued that this has been an all-or-nothing sort of approach for Phase 2, especially when the question that's being asked is, how can we reduce killing eagles? And the obvious answer might be, have fewer of the things that kill the eagles, especially with the one turbine that's so close to the nest. Why weren't some measures taken into account to maybe remove the turbine so close to the nest, or maybe fewer turbines? Can you respond to that? Sure. And consistent with what Measure Bio 10-F and the project EIS contemplated, the decision on which turbines to authorize was done in view of the eagle behavior studies, including the most recent studies. And what those studies showed is that all 20 turbines could be authorized with additional mitigation. So that's what BIA did. It authorized those turbines with additional mitigation. Now, as to other alternatives, BIA did consider Fish and Wildlife Service recommendation to only authorize the southern six turbines. And BIA responded that it would not do that because the project would then not be economically feasible. BIA also, through the project-specific avian bat protection plan, analyzed seven different curtailment scenarios of the four northernmost turbines, which are closest to the canebrake nest. And what BIA ultimately decided is to curtail the northernmost two during the breeding season, during the daytime hours when the eagles are active, when the nest is also active. And what the analysis in the project-specific plan showed is that significantly reduced the risk to nesting eagles. Was that a substitute for having come up with a supplemental EIS? Your adversary says that it was critical here to come up with a supplemental EIS. Was the supplemental plan a substitute for that? No. In fact, it's a mitigation measure that was contemplated in the EIS itself. There is no new information that is not already presented in the project EIS. The project EIS already discloses that eagles fly in the vicinity of the ridge lines and that there's a risk of collision. The EIS already discloses that there are nesting territories close to the project and that in a worst-case scenario, one of the nesting territories could be lost. And there's nothing that BIA learned post-EIS that paints a seriously different picture. Did the EIS itself consider mid-range alternatives? No, it did not. So let me back up a second. First of all, our point, I think the Court understands, is that the alternative argument has been forfeited by the plaintiffs. But that being said— Was it forfeited? It seems like these concerns were raised by the Fish and Wildlife Service. Not at the appropriate time, Your Honor. When do you think is the appropriate time? Under this Court's case law and the case law of every other court that I'm aware of, the comments have to come during the public comment period on the draft EIS. In the original? On the project EIS, that's right. On the original EIS? Yes. Okay. And none of the comments that plaintiffs are relying on came during that time period. They came after the EIS had been finalized on the— And so can you give me your best case? I think I understand what you're saying, but I don't know if there's authority for that. Can you give me, you know, a case where that proposition has been upheld or applied in the context that we have here, where an agency is relying on an earlier created EIS to support a later agency action? Well— The best case. I would say the best case is the Robertson case that we cite in our brief. But let me back up a second, Your Honor, because that scenario occurs in every single case. Every single case, the project EIS comes first, and then at some point later an agency makes a decision. It's just that more than one agency here was relying on the project EIS. But NEPA contemplates that multiple agencies can rely on one EIS. But I don't know that this case is unusual in that regard, Your Honor. Counsel, what do you contend is the proper standard for when a supplemental environmental impact statement should be prepared? When there are new and relevant impacts that are also significant, Your Honor. And new impacts rise to a level of significance when they paint a seriously different picture from that in the EIS. And it's said that the seriously different picture standard places a significant barrier on the need to prepare a supplemental EIS. Because if supplemental EIS is needed to be prepared each and every time new and relevant information came to light, the NEPA process would really be endless, and that would ultimately do a disservice to NEPA itself. And here the project EIS, again, already discloses the threats to eagles, and there's no post-EIS data that paints a seriously different picture of those threats. But I just wanted to follow up a little bit with you. But the BIA had to put a notice, put out a notice that it was planning to adopt the EIS for Phase 2, correct? It had to adopt that notice. It had to adopt the project EIS in the ROD, in the Record of Decision, yes. And that it was planning to adopt the EIS for Phase 2. It had to put out that notice. When BIA made its decision, it had to note its compliance with NEPA. Okay. In response to that notice, it seems like it received comments that, among other things, suggested the need to consider alternative designs and siting. And isn't that an argument against adopting the EIS as is, or at least doing some additional alternative analysis that the EIS lacked? No. I don't think that notice was required by NEPA, Your Honor. Again, all BIA had to do here was rely on the project EIS and so state in the Record of Decision. And for a comment to be timely, again, under this Court's case law, the comments must come during the public comment period on the draft EIS. And I would submit, Your Honor, that the range of alternatives is reasonable. What is the final criteria that the BIA relied on in the ROD? Can you point me to that place in the record where it says, this is the final criteria we are using? I would point to excerpts of record page 60 and page 91. That's where BIA said that the criteria it was using is the 2011 draft conservation plan guidance. And that draft conservation plan guidance has a five-tier process for determining risks to eagles from wind projects. And the final criteria for BIA's purpose is whether the risks are acceptable. And what BIA means when it says acceptable risks, it means that the risks can be reduced to such an extent that the economic benefits to the tribe outweigh those risks. And that's a different determination than what the Fish and Wildlife Service will be making when issuing a permit. And we're really sort of at an interlocutory stage, for lack of a better phrase, with respect to Eagle Act impacts, because it's not the BIA that has the final word here. It's the Fish and Wildlife Service. And the Fish and Wildlife Service is free to impose any additional obligations or restrictions on Phase 2 that it believes is appropriate. I'm just not quite sure that the ROD ever issues a final criteria that they're basing and that they're using. And I think that BIA says that they need to do that. Well, you might be correct that it doesn't use the word final criteria, but I submit to you that what the final criteria was or is, is that the risks to eagles are acceptable in light of the countervailing benefits to the tribe. Well, one of the difficulties I have with this case is BIA says, you know, we use the criteria that the FWS, the Fish and Wildlife Service, has suggested to look at each turbine and whether it presents an unacceptable risk. But then you have the Fish and Wildlife Service saying that we think this project presents an unacceptable risk. So I'm not sure how to reconcile those two positions. Well, so BIA was using that criteria for a different determination, right? It was trying to balance the risks with the economic benefits. Fish and Wildlife Service is going to use that criteria to make a permitting decision, which is completely different and separate from what BIA was trying to do here. And whatever, as I was explaining, whatever Fish and Wildlife Service does in the future will be a final agency action that will be challengeable in a federal court. And the aggrieved party, whoever the aggrieved party is, whether it's Thule and the tribe or whether it's the plaintiffs, they can challenge the Fish and Wildlife Service's ultimate decision in this court. But at this point, BIA's mission has to be understood to be different from that of the Fish and Wildlife Service. You say in your brief, I think it's at page 38, that BIA further warned that any unauthorized take of eagles is a violation of the Eagle Act and the lease. And you're citing to the ROD. But the ROD doesn't say that, or at least I don't read it that way. It says, unauthorized take is a violation of the law that might be referred to the Department of Justice. That's not any restriction. That's a statement of law. Why wouldn't you condition the lease on the Thule receiving the Eagle Act permit, or at least on the compliance with the law? I guess why isn't that arbitrary and capricious to disregard an agency expert's view on this? Well, the lease does contain a provision that requires Thule to comply with the Eagle Act at all times. But that really exceeds, that provision exceeds what BIA needed to do here, because it is Thule Wind who is responsible for ensuring its own compliance with the Eagle Act. That's this court's holding in Thule 1. So anything that BIA did... And I don't necessarily disagree with you that BIA, you know, isn't responsible for policing, you know, Thule's Eagle Act compliance. But the BIA also can't be blind, I don't think, to possible legal violations that it's authorizing. And here we have an expert federal agency saying specifically, this case you're authorizing is not going to satisfy our requirements. And I guess I just don't understand why that's not arbitrary or completely disregarding that and say, well, we're going to go ahead with this anyway. Well, the Fish and Wildlife Service, first of all, didn't say that Phase 2 would never qualify for a permit. What it said is that the project-specific plan did not meet the Conservation Act standard for a permit. But BIA responded, that's all fine and good, because the plan was not developed to satisfy the standard for a permit. That is a determination exclusively for the Fish and Wildlife Service. And the Fish and Wildlife Service will have the opportunity to weigh in on these issues during the permitting process, which is ongoing. And Thule has to comply with the Eagle Act. If it does not, it will be in violation of the Act. And I should also add that BIA went one step further. It required Thule to apply for a permit, even though the Eagle Act itself doesn't require anyone to apply for a permit. Permits are optional under the Eagle Act. Unless the Court has any additional questions. Judge Kuhl? No questions. Okay. Thank you. May I have a few extra minutes of rebuttal time? Two minutes, yes. Excellent. Thank you, Your Honors. I just want to make four brief points in response to the government's argument. First, on page 27 of our reply brief, the plaintiffs recited two Ninth Circuit cases, which said that it is a violation of NEPA when an agency leaves unanswered questions of a sister agency. And there are two cases there, League of Wilderness Defenders as well as Western Watersheds Project, both of which have held that when an agency, not even necessarily an expert agency, provides comments and there's no response to that in the record, which we believe is very clear to be the case here, that that is a violation of NEPA in and of itself. Second, the underlying principle of the NEPA waiver cases is that the agency must be aware at the time it makes its decision so that it has an opportunity to address any comments that are being made. We would submit that this agency was well aware in December 2013 when it issued its broad of the many different comments from Fish and Wildlife Service and others about the issues with this project. We also have submitted that even at the draft EIS stage, EPA and many others raised these issues, including the project proponent as well as the tribe, in terms of looking at a mid-range of alternatives. Third, government counsel said the test for significant new information for an SEIS is new and relevant impacts that are significant. Here we have clearly shown that the controversy between the Fish and Wildlife Service and BIA did not come into existence until after the EIS, so it could not have been considered in the EIS. And that is one of the significance factors. It's a disagreement, new information? Absolutely, Your Honor. The fact that two agencies simply disagree with each other becomes, in your view, new and significant information? Not in my view. In the view of the Council on Environmental Quality, which implements NEPA, it has a regulation at 40 CFR 1508.27B4. And what it says is if there is a substantial dispute as to the size, nature, and effect of the action, that is a controversy that requires an EIS. And so here we would submit that that requires a supplemental environmental impact statement because that issue has never been vetted to the public. It's never been disclosed to the public in any NEPA document, and for that reason alone that requires reversal of the Court's decision. Thank you. Thank you. Thank you, Mr. Eubanks, Mr. Rubender. I appreciate your arguments here today and your presentations. The case of Protect Our Communities Foundation v. Michael Black is submitted. And that concludes our docket for today. Thank you.
judges: Gould, Murguia, Amon